IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FLOYD MARTIN,

           Petitioner,               No. 2:12-cv-1384 KJM DAD P

        vs.

G. D. LEWIS, Warden,

           Respondent.          __FINDINGS & RECOMMENDATIONS__

_____/

       Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on August 5, 2008 in the Sacramento County Superior Court on charges of conspiracy to commit murder and attempted murder, with sentence enhancements for committing the crimes for the benefit of a criminal street gang and discharging a firearm causing great bodily injury.  He seeks federal habeas relief on the following grounds:  (1) his Sixth Amendment right to confront the witnesses against him was violated when a police officer testified at his trial on the basis of hearsay evidence; (2) the evidence introduced at trial was insufficient to support the jury finding that he committed the charged crimes for the benefit of a criminal street gang; and (3) his trial counsel rendered ineffective assistance in failing to prevent the jury from being exposed to improper prejudicial evidence.  Upon careful consideration of the record and the

1

applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal[1], the California Court of Appeal for the Third Appellate District provided the following factual and procedural summary:

> When Lerome Franklin (aka Little Rome) was arrested in connection with an altercation involving Timothy Hurst (aka TMoney) Franklin telephoned his fellow gang member, Floyd Martin (aka YG) and told him to "get on Money." Shortly thereafter, Martin shot Hurst several times. Luckily, Hurst survived.
>
> Separate juries convicted both Martin and Franklin of conspiracy to commit murder and attempted murder. As to both defendants, the juries found true allegations that a principal discharged a firearm causing great bodily injury, and that the crime was perpetrated to benefit the criminal street gang known as the Del Paso Heights Bloods. Each defendant was sentenced to two consecutive 25 year-to-life terms for the conspiracy and firearm enhancements. Because Franklin had suffered a prior strike, his 25 year-to-life sentence for conspiracy was doubled, resulting in a 75 year-to-life sentence. Martin received a 50 year-to-life sentence.
>
> * * *
>
> **FACTUAL AND PROCEDURAL BACKGROUND**
>
> On the afternoon of March 15, 2007, the victim, Timothy Hurst (aka T-Money) and Taurus Baker (aka Stretch) were sitting in a van next to a park in south Sacramento waiting for their buyer to arrive to complete a drug deal. Baker was a member of the Crips criminal street gang. As they sat in the van, co-defendant Lerome Franklin (aka Rome) and Anthony Colbert (aka Ant) exited a tan Buick that pulled up alongside the van, and approached the van on foot. Franklin and Colbert were members of the Del Paso Heights Bloods gang. Crips and Bloods are enemies. Franklin and Colbert told Hurst to get out of the van. Franklin tried to get inside the van, but the sliding door was broken. Colbert told Hurst, "This 'aint between you." Hurst was not a member of a gang. Franklin pulled out a gun.

---

[1] ECF No. 17-1 (hereinafter Opinion).

Just as Franklin pulled out his gun, a police car drove up.  The officers observed a struggle going on in the front passenger seat.  They identified Franklin as one of the men outside the van.  Franklin was inside the passenger window of the van with his arms outstretched, struggling with the passenger of the van.  Colbert yelled, "the Police," and Franklin threw the gun in the van.  Colbert jumped back into the Buick, which then took off.  Franklin started running.  He was soon caught and arrested, and transported to the Sacramento County main jail.

While Franklin was in the holding tank at the main jail, he made a phone call to his "girl" who proceeded to make a series of three-way calls at his direction.  During one conversation he told someone to tell "YG" to "get on wa-uh, Money."  The person on the other end of the line said, "Who?"  Franklin responded, "Money.  You hear me?"  He asked, "You know who I'm talking about, right?"  The person indicated he knew who Franklin was talking about.

Finally, Franklin got through to YG, Young General, (aka defendant Martin).  The following conversation took place:

"Franklin: Yeah, ma, you gotta get on Money, bru.

"YG: Huh?

"Franklin: You gotta get on Money.

"YG: Money?

"Franklin: Yeah.

"YG: We-how much? ...

"Franklin: No, nigger. Not chalupa, nigger, Money.

"YG: Oh-I'm trying to comprehend....

"Franklin: Arden and Del Paso, man, where your whip got snatched.

"YG: Oh, okay. Yeah, yeah, yeah, yeah.

"Franklin: You know I'm talkin' bout?

"YG: Yeah.

"Franklin: You're my momma, nigger.

"YG: He the fault?

/////

3

"Franklin: Yeah.

"YG: Well, on TMG I'm about to go right now, nigger.

"Franklin: You feel me, nigger?

"YG: Yeah

"Franklin: Nigger, MOB, my nigger.  Ma-man-man, that nigger, blu, you feel me, they gonna tell the police, nigger, nigger I tried to rob him.  You feel me?

"YG: What?

"Franklin: You feel me?

"YG: Little TMG (Unintelligible) nigger is-you are (Unintelligible) my momma, bro.  You already know, blood, I love ya, blu.  My momma, nigger, tooken care of, my nigger.  And nigger's-

"Franklin: Yeah.

"YG:-(Unintelligible) nigger.

"Franklin: TMG, my nigger, man.  Man, that's some cold shit, though, bru.

"YG: Well, my mother, blu, nigger.  You ain't gotta say nothing else, bro.

"Franklin: Yeah, for real, for real....

"YG: [U]h, they-they said something-they-they found something or some shit.

"Franklin: Yeah, they found the banger in them nigger's-in their whip . . . . you feel me, ma-ma-man, let that little ho-ass nigger know, though.  You feel me?"

After talking to Martin, Franklin told his "girl" to call Big Row (Rome).[2]  While talking to Franklin, Big Rome told him, "YG calling right now on another line." Franklin told Big Rome to see what YG had to say. After speaking  with YG, Big Rome came back on the line to Franklin and said, "Yeah, he 'bout to-you know wha I mean-to go pop-pop-pop-on young boy."  Franklin responded, "Yeah, man...."  Big Rome continued, "And, h, it's gravy and shit.  And, uh, you feel me? . . . Said-he said he gonna

---

[2]  Franklin's nickname is Little Rome.  His older brother Jerome Franklin's nickname is Big Rome.

4

do that, like he-immediately right now. . . .  And, um, yeah, them niggers got the guy and questioned him.  Uh, nigger, I don't know what them niggers thought they was getting down with . . . ."

A few hours after this call, at approximately 11:00 p.m. Hurst and Colbert were walking in the area of El Camino and Del Paso Boulevard, where they encountered several men at a motel, including Martin (YG).  One of the men said to Hurst, "So I heard you snitching."  Then the man challenged him to fight, "before YG hit you with the heat."  At that moment, YG started shooting.  Hurst felt the first two shots in his face, but managed to run away.  He was eventually taken to University of California at Davis Medical Center and treated.  The police questioned him while he was there, but he lied and said he did not know who had shot him.

Hurst suffered gunshot wounds to the chest, thigh, and hand.  He had a fractured scapula, fractured cervical vertebra, and several fractured ribs.  He suffered damage to his lungs, and a bullet lodged next to his neck.

At approximately 11:18 that night, another call was recorded from Franklin to an unidentified male.  During the conversation, the male said, "There" hella of 'em in the air, boy.  Hella flies flying around this motherfucker.... I don't know.  Man, there's hella flies flying around this motherfuckin' (Unintelligible).  It's over."

Franklin placed one more call to Martin at approximately 11:37 p.m.  Franklin told Martin, "I only got to say one (Unintelligible), I love you, nigger."  Franklin told Martin that he was his "savior, man."

Robert Quinn was a detective with the gang suppression unit of the Sacramento Police Department.  He was unaware of the above events when, in October 2007, he contacted Hurst in connection with a gang-related homicide.  He talked to Hurst to see if Hurst could identify some of the people in the gang.  Hurst was on probation at the time, and gave police his unwilling cooperation.  As Hurst looked through the pictures, he identified one of the photos as a picture of the person who shot him back in March.  Hurst did not want to tell Detective Quinn who the person was because he had been shot for snitching, and he did not want to snitch again.  Finally, Hurst stated that YG shot him, and pointed to a picture of defendant Martin.

Hurst was placed in the witness protection program and relocated from Sacramento.  He gave a statement regarding his shooting and testified at trial.

Hurst identified three other men who were present when he was shot: Giovanni Figueroa (aka Tay), a person known as Country,

/////

5

and Steven Hendrix (aka Steve-O).  Hendrix was associated with the Trigger Mob street gang, a part of the Del Paso Heights Bloods.

Detective Quinn proceeded to question Hendrix, and took a statement from him, portions of which were played for the jury when Hendrix's trial testimony was not forthcoming.  In the recorded statement, Hendrix identified Martin as the person who shot Hurst, and identified him as a Trigger Mob member.

Detective Quinn conducted a videotaped interview with defendant Franklin.  During the interview, Franklin stated he had never heard of anyone called T-Money (Hurst), and that he had not talked to YG (Martin) since he had been in jail.  Quinn told Franklin that he had tapes of his telephone conversations in which he talked about T-Money and talked to YG (Martin).  Franklin refused to explain the conversations.

The trial court accepted Detective Quinn as the prosecution's gang expert.  He testified that the Bloods are the predominant Black gang in Sacramento.  There are numerous sets of Bloods in the Sacramento area, broken down by geographic area.  These sets are further broken down into subsets.  Thus, the Del Paso Heights Bloods further break down into Elm Street, True Heights Villains, Trigger Mob (TMG), Beast Mob, and Flat Dogs, to name a few.

TMG is a part of Del Paso Heights Bloods.  Their primary activities are robbery, assault with a deadly weapon, murder, narcotics dealing, burglary and auto theft.  It has roughly 20 to 25 members.  Defendant Franklin is a validated member of TMG, and admitted his association with the Del Paso Heights Bloods.  Martin is also a validated member of the Del Paso Heights Bloods, subset TMG.

Detective Quinn testified to his knowledge of gang slang.  He stated that "banger" and "clapper" are words used for gun.  "Whip" is slang for car.  "Chalupa" means cash.  "TMG" and "MOB" both refer to Trigger Mob.  "Flies flying around" means someone or something has died.

Detective Quinn testified the phrase "get on someone" could be used in multiple contexts.  It could mean to put pressure on someone, as to get on someone about getting a lawyer.  The phrase "get it on" would mean to party or use narcotics.  He was then asked what the phrase would mean under the hypothetical scenario where a "Del Paso Heights Blood member subset Trigga Mob has been arrested for a crime, and that a Blood member perceives one witness is snitching on him, and he in turn calls another Blood member and says, hey, get on this witness.  To which the other Blood member replies, is he the fault?  And the original caller responds, yeah.  And then later on in the conversation says let that punk ass know, in that context.  What does 'get on' mean...."

Detective Quinn replied that in that context it would mean to go shoot that person or kill them so that there would not be any witnesses.

The prosecutor then posed another hypothetical: "Let's assume you have a Del Paso Heights Blood subset Trigga Mob member who goes out in broad daylight with another Del Paso Heights Blood subset Trigga Mob member to shoot, kidnap or rob a 29th Street Crip.  [¶]  During the robbery, the police pull up.  As one of the Del Paso Heights Blood gang members is pulling out his firearm, he drops the firearm, runs from that robbery or assault scene, is caught, apprehended, brought back to the scene, sees witnesses talking with police officers, is then booked into the Sacramento County Jail, makes a phone call to another Del Paso Heights Bloods subset Trigga Mob member where he says – the phrase is that I just described, get on this witness that he saw earlier during his arrest, to which the other person replies is he the fault, and the original caller responds, yeah, and then shortly thereafter let that punk ass know, and then later on that night the person who received the phone call, that validated Del Paso Heights Trigga Mob member, goes out and locates the witness, has another person confront him about being a snitch, and then right after that, from point blank range, pulls out a revolver and fires off several rounds at his head, and then after he falls and is [lying] on the ground is firing several rounds at his back and legs, critically wounding the individual, do you have an opinion as to whether or not that crime would benefit the Del Paso Heights Bloods?"

Detective Quinn responded that the crime would benefit the gang for multiple reasons.  It would serve to keep the gang member out of jail, to let other people know that this is what happens if you talk to the police, and would establish respect among the Del Paso Heights Bloods.

(Opinion at 1-11.)

After the California Court of Appeal issued its opinion on the appeals filed by petitioner and co-defendant Franklin, petitioner filed a petition for rehearing.  (Resp't's Lod. Doc. 5.)  In response, the state appellate court modified its opinion in several respects but otherwise denied the petition for rehearing.  (Resp't's Lod. Doc. 6.)[3]  Petitioner subsequently

/////

---

[3]  Those modifications do not have any bearing on petitioner's claims in this federal habeas proceeding or any portion of the Court of Appeal's opinion which addresses those claims. Accordingly, the modifications will not be incorporated into these findings and recommendations.

7

1  filed a petition for review in the California Supreme Court, which was summarily denied.

2  (Resp't's Lod. Docs. 7, 8.)

3          On September 6, 2011, petitioner filed a petition for writ of habeas corpus in the

4  Sacramento County Superior Court, in which he raised claims of prosecutorial misconduct and

5  ineffective assistance of trial counsel.  (Resp't's Lod. Doc. 9.)  The Superior Court denied that

6  petition in a reasoned decision.  (Resp't's Lod. Doc. 10.)  Petitioner subsequently filed a petition

7  for writ of habeas corpus in the California Court of Appeal, raising the same claims that he raised

8  in his petition before the Sacramento County Superior Court.  (Resp't's Lod. Doc. 11.)  That

9  petition was summarily denied.  (Resp't's Lod. Doc. 12.)  Petitioner then filed a petition for writ

10  of habeas corpus in the California Supreme Court, again raising the same claims.  (Resp't's Lod.

11  Doc. 13.)  That habeas petition was also summarily denied.  (Resp't's Lod. Doc. 14.)

12                                          ANALYSIS

13  I.  Standards of Review Applicable to Habeas Corpus Claims

14          An application for a writ of habeas corpus by a person in custody under a

15  judgment of a state court can be granted only for violations of the Constitution or laws of the

16  United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

17  interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct.

18  13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146,

19  1149 (9th Cir. 2000).

20          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal

21  habeas corpus relief:

22              An application for a writ of habeas corpus on behalf of a
        person in custody pursuant to the judgment of a State court shall
23      not be granted with respect to any claim that was adjudicated on
        the merits in State court proceedings unless the adjudication of the
24      claim -

25              (1) resulted in a decision that was contrary to, or involved
        an unreasonable application of, clearly established Federal law, as
26      determined by the Supreme Court of the United States; or

                                              8

1        (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
2        State court proceeding.

3        For purposes of applying § 2254(d)(1), "clearly established federal law" consists

4   of holdings of the United States Supreme Court at the time of the state court decision.  Stanley v.

5   Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06

6   (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is

7   clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at

8   859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

9        A state court decision is "contrary to" clearly established federal law if it applies a

10  rule contradicting a holding of the Supreme Court or reaches a result different from Supreme

11  Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640

12  (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may

13  grant the writ if the state court identifies the correct governing legal principle from the Supreme

14  Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4]

15  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360

16  F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

17  simply because that court concludes in its independent judgment that the relevant state-court

18  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

19  application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v.

20  Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal

21  habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

22  the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

23  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

24

25       [4]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
26  presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
    384 F.3d 628, 638 (9th Cir. 2004)).

1    the state court's decision." Harrington v. Richter, 562 U.S.___, ___,131 S. Ct. 770, 786 (2011)

2    (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for

3    obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

4    ruling on the claim being presented in federal court was so lacking in justification that there was

5    an error well understood and comprehended in existing law beyond any possibility for fairminded

6    disagreement." Richter,131 S. Ct. at 786-87.

7            If the state court's decision does not meet the criteria set forth in § 2254(d), a

8    reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v.

9    Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

10   Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because

11   of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

12   considering de novo the constitutional issues raised.").

13           The court looks to the last reasoned state court decision as the basis for the state

14   court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

15   2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning

16   from a previous state court decision, this court may consider both decisions to ascertain the

17   reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

18   banc).  "When a federal claim has been presented to a state court and the state court has denied

19   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

20   of any indication or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-

21   85.  This presumption may be overcome by a showing "there is reason to think some other

22   explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker,

23   501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects

24   some claims but does not expressly address a federal claim, a federal habeas court must presume,

25   subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams,

26   ___ U.S. ___, ___, 133 S. Ct. 1088, 1091 (2013).

1    Where the state court reaches a decision on the merits but provides no reasoning

2    to support its conclusion, a federal habeas court independently reviews the record to determine

3    whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

4    Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

5    review of the constitutional issue, but rather, the only method by which we can determine

6    whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853.

7    Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

8    there was no reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784.

9    When it is clear, however, that a state court has not reached the merits of a

10   petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a

11   federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v.

12   Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.

13   2003).

14   II.  Petitioner's Claims

15      A.  Confrontation Clause

16   In his first ground for relief, petitioner claims that the trial court violated his rights

17   under the Confrontation Clause of the Sixth Amendment Detective Quinn was allowed to testify

18   as an expert at trial on the subject of whether petitioner's crimes were committed for the benefit

19   of a criminal street gang.  Petitioner argues that the detective's testimony was improperly based

20   on testimonial hearsay.  (ECF No. 14 at 9-10, 13-14.)  Specifically, petitioner complains about

21   Detective Quinn's testimony: (1) regarding the facts underlying two offenses committed by "Elm

22   Street Bloods" members Tyrone Hopkins and Brandon Boyer based on police reports and a

23   discussion with the lead investigator in the Hopkins/Boyer case; (2) that Elm Street gang

24   members told him their gang was a "subset" of the Del Paso Height Bloods gang; (3) that he had

25   been told by members of the "Trigga Mob," including co-defendant Franklin, that Trigga Mob

26   was a subset of the Del Paso Heights Bloods;" (4) that a homicide and a number of assaults had

11

1   been committed by members of the Trigga Mob gang, and that he knew this "based on someone

2   saying it was 'Trigga Mob;'" and (5) that he knew petitioner as "YG," without stating the basis

3   of this knowledge.  (Id.; ECF No. 21 at 3.)

4          Petitioner argues that he was denied the right to confront and cross-examine the

5   witnesses who gave Detective Quinn the information on which he relied in forming the opinions

6   that were the subject of his trial testimony.  Petitioner states that he was prevented from

7   determining "whether the facts of the predicated crimes relayed by detective Quinn were accurate

8   and if they were committed for the 'Del Paso Heights Bloods.'"  (ECF No. 14 at 10.)  He also

9   argues that Detective Quinn's testimony violated his right to confrontation "to the extent that it

10  relied upon and conveyed to jurors the substance of testimonial hearsay."  (ECF No. 21 at 3.)

11         Petitioner further argues that Detective Quinn was "simply passing on"

12  testimonial information he had learned from police reports and interviews during the course of

13  his various investigations.  (Id. at 4.)  Petitioner asserts that all of the information obtained by

14  Detective Quinn was testimonial because it was "gathered to be used against an alleged gang

15  member in court" but, even if not all of that information was testimonial, "it is also clear that he

16  conveyed quite a bit of testimonial hearsay to the jurors."  (Id.)  In sum, petitioner claims that:

17              his rights were violated as to the confrontation clause in denying
                his right to cross examine the declarants on the critical issues of 1)
18              whether Trigga Mob was indeed a subset of the Del Paso Heights
                Bloods, 2) whether the Elm Street Bloods were in fact a subset of
19              Del Paso Heights Bloods, and 3) whether the facts of 'predicate'
                crimes as relayed by Quinn were accurate and whether those
20              crimes were indeed committed for the Del Paso Heights Bloods.

21  (Id. at 4-5.)

22         Respondent, counters by arguing that petitioner has failed to identify any

23  particular trial testimony by Detective Quinn that was based on testimonial hearsay.  He argues

24  that petitioner must point to a "statement of a witness not presented at trial," and in the absence

25  of such a statement, "logically, one cannot prove the statement was testimonial."  (ECF No. 17 at

26  18.)  Respondent contends that because it cannot be determined whether unidentified statements

12

1   made to police officers were testimonial, or whether Detective Quinn's testimony was in fact

2   based on witness statements to other law enforcement officers, petitioner has failed to

3   demonstrate his entitlement to federal habeas relief.  (Id.)

4           1.  State Court Opinion

5           In the last reasoned state court decision addressing petitioner's Confrontation

6   Clause claim, the California Court of Appeal rejected petitioner's arguments and reasoned as

7   follows:

8                 Detective Quinn's expert testimony included a recitation of the
    facts of the predicate offenses offered to establish a pattern of
9   criminal gang activity for the purpose of proving the gang
    enhancement.  (Pen. Code, § 186.22, subd. (b)(1).)[5]  He derived
10  this information from police reports and a discussion with the lead
    investigator.  He testified that TMG was a subset of Del Paso
11  Heights Bloods, and that one homicide and a number of assaults
    had been committed by TMG members.  He obtained his
12  information in part from conversations with gang members,
    victims, and witnesses.
13
           Detective Quinn's expert testimony also included his opinion that
14  TMG was a subset of the Del Paso Heights Bloods and that Elm
    Street Bloods were another subset.
15
           Citing Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d
16  177] (Crawford), Martin argues Quinn's testimony violated his
    right of confrontation "to the extent it relied on and relayed
17  testimonial hearsay" against him.[6]  Other California courts have
    rejected this argument when evaluating gang expert testimony.
18  (People v. Thomas (2005) 130 Cal. App.4th 1202, 30 Cal. Rptr.3d
    582 (Thomas); People v. Ramirez (2007) 153 Cal. App.4th 1422,
19  64 Cal. Rptr.3d 96 (Ramirez).)

20         Thomas, supra, 130 Cal. App.4th at pages 1209-1210, 30
    Cal.Rptr.3d 582, held that a gang expert's conversations with other
21  gang members were not admitted for the truth of their contents, but
    only as the basis for the expert's opinion.  As such, their use was
22  not barred under Crawford, supra.

23         In Ramirez, supra, 153 Cal. App.4th 1422, 64 Cal. Rptr.3d 96, the
    court held that testimony about the facts of predicate crimes did not
24

25       [5]  All subsequent references to undesignated codes are to the Penal Code.

26       [6]  Defendant Franklin joins in this argument.

                                         13

violate the defendant's rights of confrontation because "[h]earsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which Crawford condemned." (Id. at p. 1427, 64 Cal. Rptr.3d 96.)

Martin does not identify any particular statement that was improperly admitted, and has failed to demonstrate that the information upon which Detective Quinn relied was obtained from a custodial interrogation or was otherwise testimonial. Instead, he points to the broad category of "statements of suspected gang members, victims, and witnesses to police," and argues that when an "officer questions an individual about his or someone else's gang membership" such conversation amounts to testimonial hearsay.

The types of statements upon which Detective Quinn relied do not appear to have been the types of statements protected by the Confrontation Clause. There is no demonstration that they were "'formalized testimonial materials, such as affidavits, deposition[s], prior testimony, or confessions[,]'" or "'"solemn declarations or affirmation[s] made for the purpose of establishing or proving some fact."'" Nor is there any demonstration that they were "'declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.'" (Melendez-Diaz v. Massachusetts (2009) — U.S. — , — [174 L.Ed.2d 314, 321].) Instead, they appear to be informal exchanges of information or instances of fact-gathering that were not undertaken in contemplation of pursuing criminal charges against a particular person or persons. As such, they were not testimonial.

Following the reasoning in Thomas, supra, and Ramirez, supra, we conclude that Detective Quinn's reliance on these statements did not violate the defendants' confrontation rights.

(Opinion at 17-19.)

## 2. Applicable Legal Standards

The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Fenenbock v. Director of Corrections for California, 692 F.3d 910, 919 (9th Cir. 2012) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986)). The Confrontation Clause applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 406 (1965).

1          In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court

2   held that the Confrontation Clause bars the state from introducing into evidence out-of-court

3   statements which are "testimonial" in nature unless the witness is unavailable and the defendant

4   had a prior opportunity to cross-examine the witness, regardless of whether such statements are

5   deemed reliable.  The Crawford rule applies only to hearsay statements that are "testimonial" and

6   does not bar the admission of non-testimonial hearsay statements.  Id. at 42, 51, 68.  See also

7   Whorton v. Bockting, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application

8   to" an "out-of-court nontestimonial statement.")

9          Although the Supreme Court in Crawford declined to provide a comprehensive

10  definition of the term "testimonial," it did state that "[s]tatements taken by police officers in the

11  course of interrogations are . . . testimonial under even a narrow standard."  Crawford, 541 U.S.

12  at 52.  The court also provided the following "formulations" of a "core class" of testimonial

13  statements:  (1) "ex parte in-court testimony or its functional equivalent – that is, material such as

14  affidavits, custodial examinations, prior testimony that the defendant was unable to cross-

15  examine, or similar pretrial statements that declarants would reasonably expect to be used

16  prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials,

17  such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were

18  made under circumstances which would lead an objective witness reasonably to believe that the

19  statement would be available for use at a later trial."  Id. at 51-52.  The Supreme Court in

20  Crawford also pointed out that the Sixth Amendment Confrontation Clause "does not bar the use

21  of testimonial statements for purposes other than establishing the truth of the matter asserted."

22  Id. at 59, n.9.  "Thus, Crawford does not undermine the established rule that experts can testify to

23  their opinions on relevant matters and may relate the information and sources upon which they

24  rely in forming those opinions."  Lopez v. Horel, Civ. No. 07-4169, 2011 WL 940054, at *11

25  (C.D. Cal. Jan. 19, 2011) (citing Ortiz v. Tilton, Civ. No. 06-1752, 2008 WL 2543440, at *14, 16

26  /////

15

1   (S.D. Cal. May 5, 2008), <u>report and recommendation adopted by</u>, 2009 WL 1796537 (S.D. Cal.

2   Jun. 23, 2009)).

3   　　　　In rejecting petitioner's Confrontation Clause arguments, the California Court of

4   Appeal specifically based its reasoning on the decisions in <u>People v. Thomas</u>, 130 Cal. App.4th

5   1202 (2005) and <u>People v. Ramirez</u>, 153 Cal. App.4th 1422 (2007).  In <u>Thomas</u>, the California

6   Court of Appeal explained that:

7   　　　　<u>Crawford</u> does not undermine the established rule that experts can
　　　　testify to their opinions on relevant matters, and relate the
8   　　　　information and sources upon which they rely in forming those
　　　　opinions.  This is so because an expert is subject to cross-
9   　　　　examination about his or her opinions and additionally, the
　　　　materials on which the expert bases his or her opinion are not
10  　　　　elicited for the truth of their contents; they are examined to assess
　　　　the weight of the expert's opinion.  <u>Crawford</u> itself states that the
11  　　　　Confrontation Clause "does not bar the use of testimonial
　　　　statements for purposes other than establishing the truth of the
12  　　　　matter asserted."  (<u>Crawford</u>, <u>supra</u> 541 U.S. at p. 59, fn. 9, 124 S.
　　　　Ct. at p. 1369, fn. 9, citing <u>Tennessee v. Street</u> (1985) 471 U.S.
13  　　　　409, 414, 105 S. Ct. 2078, 85 L.Ed.2d 425.)

14  <u>Thomas</u>, 130 Cal. App.4th at 1210.  Similarly, in <u>Ramirez</u>, the California Court of Appeal

15  concluded that "hearsay in support of expert opinion is simply not the sort of testimonial hearsay

16  the use of which <u>Crawford</u> condemned."  153 Cal. App.4th at 1427.

17  　　　　Recently, the United States Supreme Court reiterated that the Confrontation

18  Clause "has no application to out-of-court statements that are not offered to prove the truth of the

19  matter asserted."  <u>Williams v. Illinois</u>, ___ U.S. ___, ___, 132 S. Ct. 2221, 2228 (2012).  Thus,

20  "[u]nder settled evidence law, an expert may express an opinion that is based on facts that the

21  expert assumes, but does not know, to be true."  <u>Id.</u>  The Court noted that an out-of-court

22  statement is testimonial if it has "the primary purpose of accusing a targeted individual of

23  engaging in criminal conduct" and, usually, it involves a "formalized statement[ ] such as

24  affidavits, depositions, prior testimony, or confessions."  <u>Id.</u> at 2242.  Numerous federal courts

25  have specifically held since the decision in <u>Crawford</u> that the introduction of otherwise

26  inadmissible evidence in support of a gang expert witness' testimony does not violate the

16

Confrontation Clause.  See e.g., United States v. Palacios, 677 F.3d 234, 243-44 (4th Cir. 2012);

United States v. Ayala, 601 F.3d 256, 275 (4th Cir. 2010); Alejandre v. Brazelton, No. C 11-

4803 CRB (PR), 2013 WL 1729775, at **10 -11  (N.D. Cal. April 22, 2013) (expert witness'

testimony concerning the meaning of defendant's tattoos based in part on hearsay statements

from an undisclosed parolees did not violate Confrontation Clause); Her v. Jacquez, No. 2:09-cv-

612 JAM TJB, 2011 WL 1466868, at *33 (E.D. Cal. Apr. 18, 2011) (gang expert's testimony

about specific gangs and their activities and membership, based on information imparted to him

by others, did not violate Confrontation Clause because underlying information not offered for its

truth but merely to support expert's opinion); Walker v. Clark, No. CV 08-5587-CJC (JEM),

2010 WL 1643580, at *15 n. 8 (C.D. Cal. Feb. 18, 2010) (citing cases); Lopez v. Jacquez, No.

1:09-CV1451 AWI JMD HC, 2010 WL 2650695, at *5 (E.D. Cal. July 1, 2010) ("[T]he Court

does not find that an objective application of Crawford would result in a finding that the gang

expert's reliance on hearsay testimony to explain his opinion that Petitioner was a member of the

West Fresno Nortenos, and that the West Fresno Nortenos area criminal street gang, to be in

violation of Petitioner's Confrontation Clause rights); Cason v. Hedgpeth, No. CV 08-4576 -JVS

(RNB), 2009 WL 1096209, at *13-14 (C.D. Cal. Apr. 22, 2009) (hearsay evidence regarding the

witness's gang membership did not violate Crawford because it was admitted not for the truth of

the matter asserted but to support detective's opinion that witness was a gang member);  Ortiz v.

Tilton, Civ. No. 06-1752-L (CAB),  2008 WL 2543440, at *16 (S.D. Cal. May 5, 2008) (gang

expert's reliance on field investigation reports, defendants' admissions as to gang member status,

and other hearsay as basis for opinion did not violate Crawford because materials were not

admitted for truth of the matter asserted and his reliance on them was subject to cross-

examination); Nguyen v. Evans, No. C 06-04630 JSW, 2008 WL 1994902, at *5 (N.D. Cal. May

5, 2008) (gang expert's testimony regarding information he received from other gang members

and victims, which he used as a basis for his opinion, did not violate Crawford); Eddington v.

Adams, No. CV F 06-1770 DLB HC, 2008 WL 397290, at *10 (E.D. Cal. Feb. 8, 2008) (gang

expert's reliance on gang member's statement as part of basis for opinion did not violate

Crawford).”); Thomas v. Chromes, No. ED CV 06-00787-JFW (VBK), 2008 WL 4597214, at *7

(C.D. Cal. Oct. 10, 2008) (gang expert's reliance on gang members' statements as basis for

opinion that petitioner was a gang member did not violate Crawford).

       3. Analysis

       Here, Detective Quinn testified at petitioner's trial that he derived much of his

information about gangs from reading police reports, and from talking to persons on the street,

other investigators, gang members, including those arrested for crimes, persons associated with

gang members, and witnesses to crimes.  (Reporter's Transcript on Appeal (RT) at 737-39, 836-

38.)  He also testified that he had spoken to “at least a hundred contacts” with respect to his

inquiries into the Del Paso Heights Bloods gang.  (Id. at 744.)  Detective Quinn testified that,

based on this information, it was his opinion that Trigga Mob and Elm Street were subsets of the

Del Paso Heights Bloods criminal street gang.  (Id. at 747, 797.)  He explained that in order to

gain intelligence on the Trigga Mob gang, he sat in on police interviews during an investigation

into a Trigga Mob gang killing.  (Id. at 749.)  Detective Quinn further testified that he contacted

Timothy Hurst, who was on probation at the time, and asked him to identify photographs of

suspected Trigga Mob members.  (Id. at 749-53.)  Quinn testified that before he went out to

speak to Hurst, he already knew that petitioner was known as “YG.”  (Id. at 754.)  Hurst also told

him that petitioner was “YG.”  (Id.)

       Detective Quinn also testified that in his opinion the primary activity of the Del

Paso Heights Blood gang was “murder, assault with a deadly weapon, robbery, burglary and sales

of narcotics.”  (Id. at 838.)  He described two “predicate” crimes that had been committed by that

gang.  First, based on a police report and on conversations with the lead investigator, Quinn

testified about a shooting involving a perpetrator named Tyrone Hopkins who, according to

Quinn, was a “validated Del Paso Heights Blood gang member.”  (Id. at 839-41.)  Second, based

on his reading of a police report, Detective Quinn described a shooting involving Brandon Boyer,

1   another Del Paso Heights Bloods gang member.  (Id. at 843-45.)  He testified that both of these

2   crimes were committed for the benefit of the Del Paso Heights Bloods gang.  (Id. at 841-43, 845-

3   46.)

4          Detective Quinn's generalized testimony about the sources of his information

5   about the Del Paso Heights Bloods and other subset groups did not violate petitioner's rights

6   under the Confrontation Clause because it was not offered for the truth of the information

7   asserted, but as a foundation for Detective Quinn's expert testimony regarding criminal street

8   gangs.  A review of the record indicates that whatever conversations Quinn may have had with

9   other persons, he did not testify at petitioner's trial to the truth of the statements made by those

10  persons he spoke to.  Rather, any such statements were used by Quinn merely to form the basis

11  for his opinions.  In this regard, the jury was specifically instructed that hearsay matters relied on

12  by expert witnesses to form their opinions were not offered for the truth of those matters but were

13  to be considered only in evaluating the basis of the expert's opinions.  (Clerk's Transcript on

14  Appeal (CT) at 823.)  Further, as an expert, Detective Quinn could properly base his opinion on

15  inadmissible evidence, including hearsay, of a kind that experts in the field regularly consult.[7]

16         Even if the statements relied on by Detective Quinn in forming his opinion

17  testimony could be considered testimonial in nature, their admission did not implicate

18  petitioner's right to confrontation.  As explained by the court in United States v. Johnson, 587

19  F.3d 625, 635 (4th Cir. 2009):

20         An expert witness's reliance on evidence that Crawford would bar
       if offered directly only becomes a problem where the witness is
21     used as little more than a conduit or transmitter for testimonial
       hearsay, rather than as a true expert whose considered opinion
22     sheds light on some specialized factual situation.  Allowing a

23  ───────────────

24         [7]  Both California and Federal rules of evidence permit testimony by an expert even
    where the expert's opinion is based on inadmissible hearsay evidence, as long as the evidence is
25  of a kind experts in the field regularly consult.  See Cal. Evid. Code § 801; Fed. R. Evid. 703;
    United States v. Steed, 548 F.3d 961, 976 n.13 (11th Cir. 2008) (noting that there exists no
26  Supreme Court precedent "regarding what otherwise inadmissible sources an expert may rely
    upon when forming an opinion").

witness simply to parrot "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion" would provide an end run around <u>Crawford</u>. <u>United States v. Lombardozzi</u>, 491 F.3d 61, 72 (2d Cir. 2007). For this reason, an expert's use of testimonial hearsay is a matter of degree. <u>See</u> Ross Andrew Oliver, Note, <u>Testimonial Hearsay as the Basis for Expert Opinion:  The Intersection of the Confrontation Clause and Federal Rule of Evidence 703 After Crawford v. Washington</u>, 55 Hastings L. J. 1539, 1560 (2004) (describing a "continuum of situations" in which experts rely on testimonial hearsay).  The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay.  As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no <u>Crawford</u> problem.  The expert's opinion will be an original product that can be tested through cross-examination.

<u>See also</u> <u>United States v. Law</u>, 528 F.3d 888, 911-12 (D.C. Cir. 2008) (finding no Confrontation Clause violation based on admission of an expert's testimony because the expert did not simply convey statements by other declarants).

Here, Detective Quinn was not merely a transmitter of testimonial hearsay. Rather, as part of his job to learn about gang culture and activities, he spoke to many persons, including gang members, victims, and other criminal investigators.  He offered an opinion of the relationship between gangs and the crimes committed by those gangs based on information he had gathered though those conversations and his own investigation.  Petitioner was given the opportunity to cross-examine Detective Quinn regarding his opinions as well as the basis thereof, and the jury was able to judge the credibility of Quinn's testimony in light of the sources he described in his testimony and upon which he relied.

The state courts' conclusion that Detective Quinn's expert testimony did not violate petitioner's rights under the Confrontation Clause is not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the state court record.  Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

/////

1    B.   Sufficiency of the Evidence

2            Petitioner's next claim for relief is that the evidence introduced at his trial was

3    insufficient to support the jury's finding that he conspired to murder Hurst for the benefit of the

4    Del Paso Heights Bloods street gang.  (ECF No. 14 at 10-11.)  Specifically, petitioner argues that

5    the evidence introduced at his trial was insufficient to show that "'Elm Street' and 'Trigga Mob',

6    the only group or gang that Petitioner was alleged to be affiliated with, were subsets or connected

7    with or affiliated with the 'Del Paso Heights Bloods.'"  (Id. at 10.)  He asserts that the evidence

8    reflects only that he was affiliated with the "Oak Park Bloods" and "Trigga Mob," which "are not

9    a subset connected to or affiliated with the 'Del Paso Heights Bloods' whatsoever."  (Id.)  He

10   argues that Detective Quinn was only "guessing" when he testified at trial that Trigga Mob and

11   Elm Street were subsets of the Del Paso Heights Bloods street gang.  (Id. at 16.)

12           Petitioner claims that in fact any crimes committed by the Elm Street or Trigga

13   Mob gangs were not committed for the benefit of the Del Paso Heights Bloods gang.  (Id. at 10-

14   11.)  He also argues that the prosecution was required to prove "'a collective organizational

15   structure or collaborative activities" between Trigga Mob and Elm Street on the one hand, and

16   the Del Paso Heights Bloods gang on the other hand, in order to demonstrate that the Trigga Mob

17   or Elm Street were subsets of the Del Paso Heights Bloods.  (Id.)  Petitioner summarizes his

18   argument in this regard as follows:

19           In sum, detective Quinn's testimony did not support a reasonable
             inference that the various subgroups of "Del Paso Heights Bloods"
20           could reasonably be viewed as parts of the same overall
             organization under the "Del Paso Heights Bloods" umbrella; nor
21           did it establish that all "Trigga Mob' members were under the "Del
             Paso Heights Bloods" umbrella, such that any crime committed for
22           "Trigga Mob" could be deemed committed for the "Del Paso
             Heights Bloods"; nor did it establish that Petitioner personally was
23           committing the offenses for the "Del Paso Heights Bloods".

24   (Id.)

25   /////

26   /////

21

1       1. <u>State Court Decision</u>

2       The California Court of Appeal rejected these arguments advanced by petitioner

3   on appeal, reasoning as follows:

4       **Crimes Benefitted Del Paso Heights Bloods**

5       The juries found that both defendants conspired to commit murder
        "for the benefit of, at the direction of, or in association with a
6       criminal street gang, the Del Paso Heights Bloods, with the specific
        intent to promote, further or assist in criminal conduct by gang
7       members pursuant to Penal Code section 186.22(b)(1)[.]"  Martin
        argues there was insufficient evidence to support the finding that
8       the crimes benefitted the Del Paso Heights Bloods.[8]

9       The trial court did not impose the section 186.22, subdivision
        (b)(1) enhancement; however, it was necessary for the jury to find
10      that Martin had violated section 186.22, subdivision (b) before the
        court could impose the 25-year-to-life firearm enhancement
11      pursuant to section 12022.53, subdivision (e).

12      We conclude there was sufficient evidence to support the jury's
        finding.  Martin relies principally upon <u>People v. Williams</u> (2008)
13      167 Cal. App.4th 983, 86 Cal. Rptr.3d 130 (<u>Williams</u>).  In
        <u>Williams</u>, it was held that there was insufficient evidence that the
14      defendant was an active participant in the large Peckerwoods gang,
        but only that he was an active participant in a smaller gang (the
15      Small Town Peckerwoods).  (<u>Id.</u> at p. 987, 86 Cal. Rptr.3d 130.)
        The court held that more than just a shared ideology and name
16      must be shown before multiple units can be treated as a whole.  (<u>Id.</u>
        at p. 988, 86 Cal. Rptr.3d 130.)  There must be evidence of
17      collaborative activities or collective organizational structure before
        various groups may be viewed as parts of the same overall
18      organization.  (<u>Ibid.</u>)

19      In <u>Williams</u>, <u>supra</u>, the defendant argued there was no evidence he
        was an active participant in the larger Peckerwoods gang, and no
20      evidence linking the Small Town Peckerwoods, of which he was a
        member, to the larger gang.  (<u>People v. Williams</u>, <u>supra</u>, 167 Cal.
21      App.4th at p. 987, 86 Cal. Rptr.3d 130.)  Here, because we are
        dealing with a different subdivision of section 186.22, it was not
22      necessary for the prosecution to prove in which gang Martin
        actively participated.  Instead, it had to prove that the crime was
23      "committed for the benefit of, at the direction of, or in association
        with any criminal street gang, with the specific intent to promote,
24      further, or assist in any criminal conduct by gang members . . . ."
        (§ 186.22, subd. (b)(1).)

25

26      _____

        [8]  Defendant Franklin joins in this argument.

                                    22

The street gang for which Martin was alleged to have committed the offense was the Del Paso Heights Bloods. The gang expert Detective Quinn testified that the Del Paso Heights Bloods had numerous subsets, one of which was the Trigga Mob Gang (TMG), and that the various subsets claim membership in the larger gang, as well as the subset. TMG members told Detective Quinn that they are Del Paso Heights Bloods first, subset Trigga Mob. Martin was a validated member of the Del Paso Heights Bloods, and the subset TMG. He was validated because of the recorded jail phone call, in which he referred to TMG and the Bloods, his admission to being an associate of TMG, pictures of him throwing a Blood hand sign and a TMG hand sign, and TMG tattoos.

Co-defendant Franklin was observed in photographs throwing the hand signs for Del Paso Heights Bloods. He had TMG and Del Paso Heights tattoos. Franklin also admitted that he was associated with the Del Paso Heights Bloods and with TMG.

The evidence of predicate crimes were two crimes attributed to the Del Paso Heights Bloods. Detective Quinn testified the instant crime would have benefitted the Del Paso Heights Bloods by keeping a fellow gang member out of jail, by letting other people know what happens if one talks to the police, and by establishing respect among the Del Paso Heights Bloods.

Martin argues there was insufficient evidence that TMG engaged in collaborative activities with other Del Paso Heights Blood subsets or that they worked under a collective organizational structure. However, unlike People v. Williams, supra, there was evidence Martin and Franklin were members of the larger Del Paso Heights Bloods, and that the crime was committed for the benefit of that gang. The evidence presented showed that both defendants identified with the Del Paso Heights Bloods, and specifically with the TMG subset. There was sufficient evidence the crime was committed for the benefit of the Del Paso Heights Bloods and that the Del Paso Heights Bloods was a criminal street gang. It was not necessary to show the organizational relationship between the TMG and the Del Paso Heights Bloods, since the evidence indicated the defendants claimed both gangs, and the crime was committed to benefit the larger gang. Nothing further was needed.

(Opinion at 19-22.)

### 2. Applicable Law

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a

23

1  conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

2  rational trier of fact could have found the essential elements of the crime beyond a reasonable

3  doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under

4  Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a

5  reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443

6  U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground

7  of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos

8  v. Smith, ___ U.S. ___, ___, 132 S. Ct. 2, 4 (2011).

9          In conducting federal habeas review of a claim of insufficient evidence, "all

10 evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino,

11 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what

12 inferences to draw from the evidence presented at trial," and it requires only that they draw

13 "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, ___ U.S. ___,

14 ___, 132 S. Ct. 2060, 2064 (2012) (citation omitted). "'Circumstantial evidence and inferences

15 drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358

16 (9th Cir.1995) (citation omitted).

17         "A petitioner for a federal writ of habeas corpus faces a heavy burden when

18 challenging the sufficiency of the evidence used to obtain a state conviction on federal due

19 process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant

20 relief, the federal habeas court must find that the decision of the state court rejecting an

21 insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson

22 and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13.

23 Thus, when a federal habeas court assesses a sufficiency of the evidence challenge to a state court

24 conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted."

25 Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011). The federal habeas court determines

26 /////

1  sufficiency of the evidence in reference to the substantive elements of the criminal offense as

2  defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

3         3.  Analysis

4         After reviewing the state court record in the light most favorable to the jury's

5  verdict, this court concludes that there was sufficient evidence introduced at petitioner's trial to

6  support the jury's finding that the attempted murder of Hurst was committed for the benefit of or

7  in association with the Del Paso Heights Bloods criminal street gang.  For the reasons expressed

8  by the California Court of Appeal in affirming petitioner's judgment of conviction, there was

9  evidence introduced at trial from which the jury could have found that Trigga Mob was a subset

10  of the Del Paso Heights Bloods and that the attempted murder of Hurst was therefore committed

11  for the benefit of the Del Paso Heights Bloods.  The question in this federal habeas action is not

12  whether there was evidence from which the jury could have found for the petitioner on these

13  issues.  Rather, in order to obtain federal habeas relief on this claim, petitioner must demonstrate

14  that the state courts' denial of relief with respect to his insufficiency of the evidence arguments

15  was an objectively unreasonable application of the decisions in Jackson and Winship to the facts

16  and evidence of this case.  Petitioner has failed to make this showing, or to overcome the

17  deference due to the state court's findings of fact and its analysis of this claim.  Accordingly, he

18  is not entitled to federal habeas relief on his claim of the insufficiency of the evidence.

19       C.  Ineffective Assistance of Counsel

20       In his final ground for relief, petitioner claims that his trial counsel rendered ineffective

21  assistance in failing to accept the trial judge's offer to excuse the jury hearing his case[9] during the

22  testimony of Jerome Franklin, co-defendant Franklin's brother, and in failing to move to exclude

23  evidence which suggested that he was responsible for another homicide.  (ECF No. 14 at 17.)

24

25       [9]  As noted in the Opinion of the California Court of Appeal affirming the judgment of
26  conviction, petitioner Martin and his co-defendant Franklin were tried together with separate
   juries considering the case against each.  (Opinion at 1.)

1   With respect to his first argument, petitioner explains that the trial court "offered to excuse

2   Petitioner's jury when Jerome Franklin was called as a witness to testify." (ECF No. 21 at 7.)

3   After conferring with petitioner, trial counsel declined to have his jury excused from the

4   courtroom during that testimony.  (Id.; see also RT at 1012-13.)  Petitioner does not explain in

5   what respect he believes Jerome Franklin's testimony was harmful to his case.  However, the trial

6   judge characterized that testimony as follows:

7               I just think that what happened was he testified as expected in
               direct, but he was just utterly devastated and blown up by the
8               prosecutor in his cross-examination.  It was apparent that he was
               lying, and he was trapped in his numerous lies when he hit the
9               stand.  He denied any gang membership.  He denied any
               knowledge of certain facts.  And he was directly impeached by the
10              prosecution throughout his testimony.  And the devastating impact
               of that was very apparent to the jury.

11

12  (RT at 1677.)

13              In support of his second argument, petitioner has attached to his petition a partial

14  transcript of Detective Quinn's interrogation of a Steven Hendrix, which was introduced into

15  evidence by the prosecution at petitioner's trial, wherein Mr. Hendrix states that he heard on the

16  streets that "Y.G." shot "Chuck." (ECF No. 14 at 21-25.)  Petitioner argues that his trial counsel

17  rendered ineffective assistance in failing to have this document redacted to delete references to

18  his possible involvement in the killing of "Chuck."  He contends that trial counsel's errors in this

19  regard were prejudicial because the evidence against him was otherwise "far from

20  overwhelming." (ECF No. 21 at 8.)

21              Petitioner has also attached to the instant petition a declaration from his trial

22  counsel.  Therein, trial counsel explains that he had no tactical reason for failing to excuse the

23  jury hearing petitioner's during the testimony of Jerome Franklin, even though he knew that

24  Jerome's testimony would hurt petitioner's case. (ECF No. 14 at 29-30.)  Trial counsel states

25  that he simply made "a mistake" in this regard  (Id.)  Petitioner's trial counsel also declares that

26  he erred in failing to seek the redaction from the Hendrix interrogation transcript the entry "that

Hendricks [sic] heard on the street that my client had killed an individual." (Id.)  Counsel also

claims that his failure to have this portion of the transcript redacted "was not a tactical decision

on my part." (Id. at 30.)  He also declares that petitioner was forced to take the witness stand

because of counsel's error in failing to excuse petitioner's jury during the testimony of Jerome

Franklin.  (Id.) Finally, trial counsel states that, without the testimony of Jerome Franklin and

petitioner, he believes he had sufficiently attacked the credibility of two key prosecution

witnesses sufficient to create a reasonable doubt as to petitioner's guilt.  (Id.)

### 1. State Court Decision

The California Court of Appeal rejected petitioner's arguments that he had

received ineffective assistance of trial counsel, reasoning as follows:

> After the jury rendered its verdict, defendant Martin brought a
> motion for new trial based on a claim of ineffective assistance of
> counsel.  The grounds for the claim were twofold.  First, he
> claimed his trial counsel should not have allowed his jury to hear
> the testimony of Jerome Franklin, Lerome Franklin's older brother,
> whom Lerome Franklin called as a witness in his defense.  Second,
> he claimed his trial counsel should have redacted a portion of the
> videotaped statement of Steven Hendrix, in which Hendrix said he
> had heard on the streets that Martin killed an individual named
> Chuck Nitty.
>
> Martin argued in the new trial motion that Jerome Franklin's
> testimony harmed his case not because of any statements Jerome
> Franklin made incriminating him, but because it was apparent from
> Jerome's testimony that he was lying, because Jerome told the jury
> he (Jerome) was a pimp, and because he otherwise conducted
> himself in such a fashion as to completely alienate the jury.  Martin
> argued he never would have taken the stand had his case not been
> so damaged by Jerome's testimony.  He claimed that Hendrix's
> testimony that he had heard Martin killed Chuck Nitty was not
> prejudicial standing alone, but was stronger when considered in
> conjunction with Jerome's testimony.
>
> To prevail on a claim of ineffective assistance of counsel, Martin
> must not only demonstrate that his trial counsel's performance was
> deficient, he must also show prejudice.  (In re Hardy (2007) 41
> Cal.4th 977, 1018, 63 Cal. Rptr.3d 845, 163 P.3d 853.)  We
> conclude that Martin has not demonstrated prejudice.  We need not
> determine whether counsel's performance was deficient where we
> find no prejudice.  (People v. Medina (2009) 171 Cal. App.4th 805,
> 819, 89 Cal. Rptr.3d 830.)

27

Prejudice is shown if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Strickland v. Washington (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674]; accord, In re Cox (2003) 30 Cal.4th 974, 1020, 135 Cal. Rptr.2d 315, 70 P.3d 313.)  A reasonable probability is one that is sufficient to undermine confidence in the outcome." (In re Hardy, supra, 41 Cal.4th at p. 1018, 63 Cal. Rptr.3d 845, 163 P.3d 853.)

Martin claims prejudice because the evidence of a conspiracy and of his identity as the shooter was not overwhelming.  We disagree.

The evidence of the conspiracy was presented in the form of the recorded jail phone conversations between defendant Franklin and others, including Martin.  In those conversations, Franklin told one of the men he called to "Tell that nigger YG to get on wa-uh, Money."  The man replied, "Who?" and Franklin answered, "Money.  You hear me? . . . You know who I'm talking about, right?"  Later, talking to Martin (YG) he said, "you gotta get on Money," and clarified he was not talking about "chalupa," slang for money or cash.  Martin asked "He the fault?"  When Franklin replied that he was, Martin said, "well, on TMG I'm about to go right now, nigger."  Martin told Franklin it was "tooken care of" and that he did not have to "say nothing else, bro."

Still later, Franklin was on the phone to his older brother, Jerome, who told him, "he 'bout to – you know what I mean – to go pop-pop-pop-on young boy."

In addition to these calls, there was evidence Hurst was accused of being a snitch immediately before he was shot.

Finally, the timeline around the shooting was persuasive evidence supporting a conspiracy.  As the trial court stated when ruling on the motion for new trial,

> "And then lastly, the final crushing blow to the defendant's case was the District Attorney did an outstanding job in his opening portion of his closing argument.  He sat down all the loose ends, all the leads, all the information that didn't quite gel.  He set out a timeline minute by minute and had each phone call played in live action audio from the defendants, Mr. Martin, Mr. Franklin, from Big Ro [Jerome], actual phone calls.  And then he placed them by sequence of what was going on out in the streets, and it destroyed any doubt in my mind, in any juror's mind, as to who was guilty in this case.  Because you could see exactly when the shooting went down, when the police calls went down, when

/////

28

the ambulance calls went, everything in relation to the sequence of the calls from the jail.

And then on top of it, you get Mr. Martin and Mr. Franklin's celebratory phone call at the very end of the case.  There is no doubt that Mr. Martin is the shooter.  There's no reason to consider a new trial motion under these circumstances."

The evidence that Martin was the shooter was also persuasive.  The victim testified that Martin was the shooter.  Hendrix, an eye witness, told police Martin was the shooter, although he was apparently afraid to finger Martin on the stand.

Given the strength of the evidence against him there is not a reasonable probability that he would have received a more favorable outcome had his jury not heard Jerome Franklin's testimony, or Hendrix's statement that he was rumored to have killed someone else.  Martin's ineffective assistance of counsel claim fails.

(Opinion at 22-25.)

    2. <u>Applicable Law</u>

    The clearly established federal law with respect to ineffective assistance of counsel claims is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and its progeny.  To succeed on a <u>Strickland</u> claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." <u>Id.</u> at 687.  Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." <u>Id.</u> at 687–88 (internal quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" <u>Richter</u>, 131 S. Ct. at 787-88. (quoting <u>Strickland</u>, 466 U.S. at 687).

    A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 669.  <u>See also</u> <u>Richter</u>, 131 S. Ct. at 789.  Reviewing courts must also "indulge a strong presumption that

29

1   counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>,

2   466 U.S. at 689.  This presumption of reasonableness means that the court must "give the

3   attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible

4   reasons [defense] counsel may have had for proceeding as they did." <u>Cullen v. Pinholster</u>, ___

5   U.S. ___, ___, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks and alterations omitted).

6          As to the second prong of the test, prejudice is found where "there is a reasonable

7   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

8   been different." <u>Strickland</u>, 466 U.S. at 694.  A reasonable probability is "a probability sufficient

9   to undermine confidence in the outcome." <u>Id.</u>  "The likelihood of a different result must be

10  substantial, not just conceivable." <u>Richter</u>, 131 S. Ct. at 792.  A reviewing court "need not

11  determine whether counsel's performance was deficient before examining the prejudice suffered

12  by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an

13  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

14  followed." <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at

15  697).

16         Under AEDPA, "[t]he pivotal question is whether the state court's application of

17  the <u>Strickland</u> standard was unreasonable." <u>Richter</u>, 131 S. Ct. at 785.  "[B]ecause the Strickland

18  standard is a general standard, a state court has even more latitude to reasonably determine that a

19  defendant has not satisfied that standard." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009).

20  <u>See also</u> <u>Cheney v. Washington</u>, 614 F.3d 987, 990 (9th Cir. 2010).

21         3.  <u>Analysis</u>

22         This court agrees with the conclusion reached on appeal by the California Court of

23  Appeal that any error by petitioner's trial counsel in failing to prevent petitioner's jury from

24  hearing the testimony of Jerome Franklin and in failing to redact potentially damaging portions

25  of witness Hendrix's videotaped statement did not result in any prejudice to petitioner.  As noted

26  by the California Court of Appeal, the evidence of the phone calls between petitioner, Jerome

1   Franklin, and Lerome Franklin, and the timeline of events as laid out by the prosecutor, provided

2   overwhelming evidence of petitioner's involvement in a conspiracy to murder Hurst.  With

3   respect to the identity of the shooter, in addition to the above-described phone calls Hurst

4   testified at trial that petitioner was "Y.G." and that Y.G. shot him.  (RT at 190, 244-50.)  Given

5   this evidence, the failure of petitioner's trial counsel to excuse the jury considering petitioner's

6   case during the apparently questionable testimony of Jerome Franklin on behalf of Lerome

7   Franklin and/or to redact the Hendrix transcript does not undermine confidence in the verdict in

8   this case.

9        In this case there is simply no "reasonable probability that, but for counsel's

10  unprofessional errors, the result of the proceeding would have been different."  Strickland, 466

11  U.S. at 694.  The decision of the California courts to the same effect is not contrary to or an

12  unreasonable application of Strickland, nor is based on an unreasonable determination of the

13  facts of this case.  Therefore, petitioner is not entitled to federal habeas relief with respect to his

14  ineffective assistance of counsel claim.

15                                 CONCLUSION

16       Accordingly, for all the reasons set forth above, IT IS HEREBY

17  RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

18       These findings and recommendations are submitted to the United States District

19  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

20  days after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23  shall be served and filed within fourteen days after service of the objections.  Failure to file

24  objections within the specified time may waive the right to appeal the District Court's order.

25  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

26  1991).  In his objections petitioner may address whether a certificate of appealability should issue

31

1   in the event he files an appeal of the judgment in this case.  <u>See</u> Rule 11, Federal Rules

2   Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

3   when it enters a final order adverse to the applicant).

4   DATED: July 17, 2013.

5

6   _____

7   DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

8   DAD:8:
    martin1384.hc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26